IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J. C.,                                          :    **SEALED CASE**
                        Petitioner             :
                                               :
            v.                                 :    No. 1867 C.D. 2016
                                               :    ARGUED:  October 19, 2017
Department of Human Services,                  :
                        Respondent             :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE J. WESLEY OLER, JR., Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE OLER, JR.                    FILED:  December 28, 2017


            In this ChildLine Registry case, Petitioner (J.C.) petitions for review of
the October 17, 2016, order of the Secretary of the Department of Human Services
(Secretary) that upheld an order of the Bureau of Hearings and Appeals (BHA) dated
February 10, 2016. The order of the BHA adopted the recommendation of an
Administrative Law Judge (ALJ) to deny J.C.'s Appeal contesting, and seeking to
expunge, an indicated report of child abuse entered on the ChildLine & Abuse
Registry (ChildLine).[1]

---

[1] Our review requires that the decision be affirmed absent a finding that constitutional
rights were violated, that an error of law was committed, that the procedure employed was contrary
to statute, or that the findings of fact are not supported by substantial evidence. *G.V. v. Department
of Public Welfare,* 91 A.3d 667, 672 (Pa. 2014).

J.C. contends that "[t]he B[HA] incorrectly determined that the [Department of Human Services] met its burden to provide substantial evidence that child abuse occurred in this matter."[2] An evaluation of the merits of the parties' arguments in this case, which involves an acrimonious relationship between J.C. and the child's mother (M.S.) and allegations of taint with respect to the child's (Ja.C.) testimony, requires a comprehensive review of the facts.

PROCEDURAL HISTORY AND STATEMENT OF FACTS

Ja.C., the subject of this proceeding, is a now eleven-year-old boy. (R.R. at 1174a–75a.) He was born on May 26, 2006, to J.C. and M.S. (R.R. at 1174a-75a.) J.C. is presently 62 years old and M.S. is 47 years old. (R.R. at 356a.) The parents met in 2002, married in 2005, separated in September 2008, and were divorced in April 2011. (R.R. at 1174a-76a.)

Commencing with Ja.C.'s birth in 2006, M.S. displayed a high degree of concern about physical contact between J.C. and Ja.C. (R.R. at 1428a.) M.S. requested that J.C. wear gloves under certain circumstances when touching Ja.C. and ultimately required a sanitary precaution provision in their custody order with respect to such contact.[3] (R.R. at 1207a-08a.) M.S.'s concern was heightened by: (1) a disclosure J.C. had made to M.S. that he had been sexually abused as a child; (2) the child's complaint in the spring of 2011 that J.C. tickled him; and (3) an

---

[2] Petition for Review, 11/16/16, at ¶5c.

[3] J.C. had contact dermatitis and had been diagnosed with hepatitis C. (R.R. at 1207a.) Ja.C. has tested negative for hepatitis C. (R.R. at 1429a.)

incident that occurred in August of 2011. (R.R. at 1182a-83a, 1208a-11a, 1235a, 1251a-52a, 1428a-29a, 1436a.)

In the August 2011 incident, the family, although no longer united, shared an overnight vacation in Wildwood, New Jersey, where the parents had adjacent rooms and Ja.C. had access to both rooms. (R.R. at 308a, 1182a-83a, 1210a-11a.) At one point, five-year-old Ja.C. went from M.S.'s room into J.C.'s room and M.S. observed them lying on J.C.'s bed in a "spoon"-like configuration, with J.C. reclined behind Ja.C.[4] (R.R. at 1183a.) J.C. was massaging Ja.C.'s arms, back and chest. (R.R. at 1183a, 1252a.)

Regarding the contact as too "sensual," M.S. "mouthed something" to J.C., who evidently ceased the activity but appeared to be angry.[5] (R.R. at 1183a.) Shortly thereafter, the child approached the mother and said, "Daddy wants to know why he can't keep tickling me. He says you don't like it." (R.R. at 1183a.) This provoked a yelling argument between the parents in Ja.C.'s presence, the subject of which was J.C.'s allegedly "inappropriate" reaction to being confronted and M.S.'s allegedly distorted perception of J.C.'s activities. (R.R. at 1184a.)

Initially, J.C. had supervised visitation with Ja.C. (R.R. at 1178a.) By the summer of 2011, however, J.C. had succeeded in having his court-ordered

---

[4] J.C. was injured in an accident in 2009, which, according to his uncontradicted testimony, crushed his legs and forced him to lie in a fetal position with a pillow between his legs to manage the pain. (R.R. at 1872a-73a, 1182a.) When J.C. was able to return to work following the injury, he was confined to a desk job, according to M.S. (R.R. at 1177a.)

[5] According to J.C.'s testimony concerning this incident before the ALJ, Ja.C. had come into J.C.'s room and requested J.C. to tickle him. (R.R. at 1873a.)

3

custodial periods expanded to include one overnight per week. (R.R. at 1180a.) The custodial situation proved concerning to M.S., who pressed her attorney for advice on whether something could be done based upon a list of transgressions by J.C. (R.R. at 313a, 1230a.) The following is an example of alleged parental misconduct by J.C.:

> November 26, 2011 and November 27, 2011: [J.C.] sent me a photo of [Ja.C.] using a hand saw to cut down a Christmas tree himself. You can see the picture. [J.C.] obviously showed him how to hold it. But [Ja.C.] was not wearing anything to protect his eyes or his hands. He is five years old, too young to be using a saw of that size without at least wearing some eye protection. I could not find anything on the internet about children cutting down trees at Christmas tree farms. But on every site about children using real tools, the safety warning is the same, "Children should wear protective eye glasses (goggles) when handling any tools" . . . .
>
> I told [J.C.] that [Ja.C.] should have been wearing goggles and asked if this tree farm actually allowed children this small to use a saw to cut a tree. He said, "we went way back into the woods and just picked one". The photo is also attached. . . .

(R.R. at 312a-13a.) The e-mail to M.S.'s attorney did not mention the August, 2011, incident, nor did it indicate any concern on the part of M.S. with respect to sexual abuse of Ja.C. by J.C. (R.R. at 312a-13a.) M.S. concluded the request for advice by saying that she did "not know if any of this is enough reason to take action." (R.R. at 313a.)

Without offering a remedy in the form of legal action, M.S.'s counsel's response to the e-mail was to inquire whether M.S. felt a threatening letter from the

attorney to J.C. might be helpful. (R.R. at 311a.) In reply, M.S. observed that "[t]he only threatening letter that will help is one that contains a valid threat."[6] (R.R. at 310a.) In response, the attorney advised M.S. that she "ha[d] about a 50/50 chance of prevailing in an effort to curtail [J.C.'s] visits" and recommended that M.S. "[t]hink about it for a while." (R.R. at 310a.)

About two weeks later, on December 15, 2011, M.S. notified her attorney for the first time about the August 2011 incident, where "[J.C.] was lying down behind [Ja.C.] and rubbing his back in a way that was too sensual for a father and son. It FELT NAUSEATING to see it . . . ." (R.R. at 308a.) M.S. related that she had told J.C. that the activity was "inappropriate" and that a confrontation had ensued.[7] (R.R. at 308a.) M.S. also stated that, "I don't know if I mentioned this before, but [J.C.] has a habit of touching/rubbing [Ja.C.] inappropriately. . . . I can not allow this to go on." (R.R. at 308a.) M.S. related further:

> Back in the spring [of 2011, Ja.C.] explained to me that his Dad rubs his ([Ja.C.'s] legs) when they lay down to watch a movie, etc. This takes place on the couch and in the bedroom. [Ja.C.] said he didn't like it but that his Dad wouldn't stop. I told [Ja.C.] to tell him to please stop[], but [Ja.C.] said [J.C.] wouldn't stop sometimes. I finally demanded to [J.C.] that he stop this because it was making [Ja.C.] into a victim who felt helpless. He didn't want [J.C.'s] hands on him, but [J.C.] would not respect that. [J.C.] agreed to stop and promised [Ja.C.] he wouldn't do it anymore. . . .
>
> . . . [I]t has started up again . . . .

---

[6] It appears that such a letter was sent. (R.R. at 308a.)

[7] M.S. conceded that "there was nothing really visibly being done that looked like molestation" and that "it didn't look like abuse." (R.R. at 308a.)

(R.R. at 308a.)  M.S. said that she had "casually asked [Ja.C.] if Daddy still rubs [him], and [Ja.C.] said 'yes' as if he was about to get in trouble. . . ." (R.R. at 309a.) She further related:

> [Ja.C.] showed me that Daddy rubs him along the top inch or so of the back of his pull-ups.[8]  I asked if he rubbed other places and pointed to them with my hand.  [Ja.C.] indicated that [J.C.] has not touched his genitals or buttocks, but [Ja.C.] has already caught on that I was concerned, so it is hard to know FOR SURE what [J.C.] has done.  [Ja.C.] also said that [J.C.] rubs his upper legs / thighs. . . .
>
> I am screaming inside about this right now and I need to know that something can be done legally. PLEASE. This cannot go on. That man cannot be allowed to be alone with [Ja.C.] Not at all. . . .
>
> . . . Tonight, [Ja.C.] got a piece of scrap paper and wrote, "DAD DONT TOUCH ME" He asked me to spell "touch" for him and then wrote the rest. He is saving it in his backpack to give to [J.C.] at his next Wednesday visit
>
> . . . I DO NOT WANT [J.C.] ALONE WITH [Ja.C.]. . . .

(R.R. at 309a.)

In the absence of an immediate response to this intensified set of accusations, M.S. pressed her attorney with a reiteration of the allegation of "sick behavior" on the part of J.C., concluding the e-mail with "Is there something we can do?"  (R.R. at 308a.)  The attorney's advice in response, however, was that "[w]e don't have enough evidence yet."  (R.R. at 307a.)

---

[8] Because of bed-wetting, Ja.C. wore diapers at night at this period of his life.  (R.R. at 309a.)

6

At this point, in the apparent absence of a judicial means to preclude unsupervised contact between J.C. and Ja.C., M.S. took actions that initiated a different process. Having assisted Ja.C. with the note reading "DAD DONT TOUCH ME" referred to above, M.S. was aware that it had been placed in Ja.C.'s book bag and was cognizant of the mandatory reporting obligations of school personnel.[9] (R.R. at 307a, 309a, 419a, 1244a, 1246a, 1371a, 1399a.) When the note was not discovered by Ja.C.'s teacher, as M.S. had hoped it would be, M.S. sent an e-mail to Ja.C.'s teacher on Wednesday, December 21, 2011. (R.R. at 307a, 315a-16a, 1245a.)

The e-mail to Ja.C.'s teacher related the development of a "horrible" situation for Ja.C. where he was being "rubb[ed] … and touch[ed] in places that [were] not comfortable" by J.C. during periods of unsupervised visitation; it reported that Ja.C. had written a note saying "DAD DONT TOUCH ME" and that he was keeping it in his backpack for delivery to J.C. later that day during a scheduled visitation period. (R.R. at 315a-16a.) In lieu of this plan's being carried out, M.S. invited the teacher to engage Ja.C. on the subject and "take the little note out of his bag" if Ja.C. concurred. (R.R. at 316a.)

Predictably, J.C.'s period of temporary custody with Ja.C. that day was interrupted by the arrival of a caseworker from the Chester County Department of Children, Youth and Families. (R.R. at 355a, 1877a.) The event was described in uncontradicted testimony by J.C. as follows:

---

[9] *See* 23 Pa. C.S. §6311. M.S. was a school teacher at the time. (R.R. at 1271a.)

7

A.    . . . [The caseworker] and three police officers showed up at the door.

Q.    Okay. Was [Ja.C.] there?

A.    [Ja.C.] was there.

Q.    Okay. And what happened after that? Were you arrested at that time?

A.    No. They sort of forced their way into the house, which was very uncomfortable. They asked me to take my son and put him—

[ATTORNEY FOR CHESTER COUNTY CF&Y]:

Objection. I don't know who they is.

A.    They are the police and [the caseworker]. There were three police officers in my house uninvited. I invited one and [the caseworker]. They pushed the door open and smashed the door. They forced their way into the home.

They asked me to put my son—to turn on a TV program, so he went in to the living room, but it's a giant open room. I put [Ja.C.] on the recliner, turned on the TV. And then [the caseworker] informed me that I was being investigated for inappropriate contact with my son.

(R.R. at 1874a-75a.)

This incident occurred when Ja.C. was five years old. (R.R. at 1829a, 1877a.) At the age of nine, when Ja.C. testified before the ALJ, he still remembered the event. (R.R. at 1829a, 1853a.) Ja.C. testified that he believed that when police are chasing someone they chase bad people and that their presence at J.C.'s house made him think that J.C. was bad. (R.R. at 1854a.)

Two days after this intervention by authorities, on December 23, 2011, a forensic interview with Ja.C. was conducted by a Chester County detective. (R.R. at 331a-47a.) In the interview, Ja.C. correctly identified various parts of the body, including the "penis" and "butt," stated that he liked it when J.C. tickled and rubbed his back, head, belly, and feet, and said that he did not like it when J.C. tickled and rubbed his knees. (R.R. at 338a-40a, 342a-44a.) Ja.C. also engaged in this exchange with the interviewer:

> [Ja.C.]: . . . I don't like it when he rubs me right here.
>
> DET: Okay.
>
> [Ja.C.]: *Because my mom said he cannot rub me there.*
>
> DET: And is that—where would that be on here? You pointed to that part of your body right above your butt on your back?
>
> [Ja.C.]: No right. . .
>
> DET: Right there?
>
> [Ja.C.]: Yeah.
>
> DET: Okay. So what I'm looking at is just above your heinie or your butt? Okay. . . .
>
> [Ja.C.]: Yeah . . . .

(R.R. at 343a (emphasis added).) The location on the body being referred to in this colloquy has been described as a place above the top of Ja.C.'s pants. (R.R. at 1761a.)

9

With regard to any touching of his private areas, Ja.C. responded to questions as follows:

> DET: Okay. L-let me ask you this question [Ja.C.]. Is there any place on your body that nobody's supposed to touch? Where at? Where are those places that nobody's allowed to touch?
>
> [Ja.C.]: Your privates and your privates are this. . .
>
> DET: And that's your butt.
>
> [Ja.C.]: . . .and that.
>
> DET: And a penis. So nobody's allowed to touch your butt and your penis. Okay good. So you. . .
>
> [Ja.C.]: Because those are your privates.
>
> DET: Yep you're right. They're your privates. And has that ever happened to you? Has anybody ever touched you there?
>
> [Ja.C.]: Except when they wipe me when I get off.
>
> DET: Oh sure. Sure and that's - that's fine. . . .

(R.R. at 344a.)

In response to direct questions at the conclusion of the interview, Ja.C. denied that anything bad was happening to him that he wanted to tell the detective about. (R.R. at 346a.) Ja.C. specifically denied that anyone had ever touched him on his penis or butt. (R.R. at 346a.)

10

Following this interview on December 23, 2011, M.S., being aware that criminal charges were determined to be unwarranted, nevertheless unilaterally cancelled J.C.'s scheduled Christmas custodial period. (R.R. at 1260a, 1362a.) In response, J.C. filed a petition for contempt. (R.R. at 1262a-63a, 1878a.) J.C. also filed a petition for expanded custodial rights and stopped paying voluntary child support. (R.R. at 1213a-14a, 1878a.)

The investigation by the Chester County Department of Children, Youth and Families "found no evidence to substantiate abuse" during the period from July 1, 2011, to December 20, 2011, and the case was closed on December 30, 2011, with a determination of "unfounded." (R.R. at 352a, 355a-57a.) In this regard, the agency reported that "[t]he agency ha[d] visited [both parents' homes] and found both homes to be safe and appropriate"; it advised that it had no "concerns regarding [Ja.C.'s] safety in either home." (R.R. at 352a.)

Neither the termination of the police investigation without criminal charges nor the "unfounded" conclusion of the child protective services assessment satisfied M.S. (R.R. at 1263a, 1360a.) On the contrary, M.S. was "determined" to have the investigation reopened. (R.R. at 1360a, 1369a.)

In this regard, the caseworker advised M.S. that, if a trained therapist "heard something that could be acted upon," the therapist could "do the reporting" and the investigation would be reopened. (R.R. at 418a, 1373a.) A child advocate suggested to M.S. that "more substantial evidence of sexual abuse" would be needed to warrant action. (R.R. at 418a.) Finally, M.S. was told by both the police and the

caseworker that "if anything else happened" the investigations would be reopened. (R.R. at 1360a.) In rapid succession, several things did happen.

First, on January 3, 2012, when an adult volunteer named Julie at Ja.C.'s school inquired about a rip in his gym shirt that was unrelated to his father, he spontaneously announced: "I just keep telling my dad to stop doing bad things and he just doesn't listen and the cops keep chasing him." (R.R. at 363a, 1114a-17a.)

Second, on January 8, 2012, J.C.'s period of temporary custody was again interrupted by police. (R.R. at 358a.) The officer's appearance was precipitated by a call from M.S., who reported that Ja.C. had smelled smoke in the residence.[10] (R.R. at 359a-60a.) The investigation was concluded "without incident." (R.R. at 360a.)

Third, at about the same time, M.S. dispatched an e-mail to her congressman. (R.R. at 417a.) This e-mail "regard[ed] the shortcomings of Chester County Child, Youth and Families—Child Protective Services, the agency that investigated [J.C.'s] inappropriate behavior towards [Ja.C.]." (R.R. at 417a.) The

---

[10] The police report regarding the incident noted:

> West Chester Fire Dept. was dispatched. Additional info was received there is an ongoing custody issue.
>
> On arrival, I spoke to [J.C.] he was advised of the report and he advised everything was okay, he burnt some food in the oven. [Ja.C.] appeared agitated by the police presence. Completed without incident.

(R.R. at 359a-60a.)

communication by M.S. was followed up by M.S.'s sister contacting the congressman's office and seeking help for her nephew. (R.R. at 415a-16a.)

Fourth, on February 7, 2012, M.S. reported to Ja.C.'s teacher that Ja.C. had revealed that "the touching had started again." (R.R. at 413a.) M.S. represented that on the previous day Ja.C. "ha[d] shown [her] a few places that he did not indicate before. . . . [N]ow the touching involves more areas that are considered 'private[.]'" (R.R. at 413a.)

Fifth, on February 8, 2012, M.S. sent another e-mail to her congressman's office. (R.R. at 417a-19a.) In it, she accused the county agency of "creat[ing] a more dangerous monster" who "has lied to, manipulated, silenced, and continued to abuse my young child." (R.R. at 417a.) M.S. reported that J.C. was "rub[bing] his hands all over [Ja.C.'s] buttocks and in the crease between them." (R.R. at 418a.) M.S. recounted the incident involving the note written by Ja.C. to J.C., and stated that "[s]omeone at [Ja.C.'s] school found and took the note out of [Ja.C.'s] school bag and then reported it to Childline." (R.R. at 417a.) The e-mail concluded:

> Please, if you can, PLEASE help. Please direct this email on to [the Congressman]. All of the teachers, my colleagues, here at [the school where I teach] . . . are all curious to see whether my son, my child, a little boy that they also love, can be saved from his father's sick and twisted behaviors. . . .

13

(R.R. at 419a.) In response, the congressman's office offered to forward the e-mail to the district attorney in her county, and M.S. replied that she hoped the district attorney's office would contact her as a result. (R.R. at 420a.)

Finally, a therapist engaged by M.S. for Ja.C. was told by M.S. of "new information" concerning inappropriate touching, which M.S. had referred to in her February 7, 2011, communication to Ja.C.'s teacher. (R.R. at 413a, 1306a-08a.) In retaining this therapist, M.S. knew that she met the mandatory reporter qualification implicit in the caseworker's advice on how to reopen the case, and told the therapist about the prior investigation of J.C. for inappropriate touching. (R.R. at 1309a, 1378a, 1390a-91a.) M.S. testified that she knew the "new information," if related by Ja.C. to the therapist, would result in a mandatory report. (R.R. at 1309a.) Significantly, Ja.C. was aware at this time that M.S. was upset that J.C. had not been arrested and that this was a reason Ja.C. was visiting the therapist. (R.R. at 1860a.)

A technique of the therapist to elicit information from Ja.C.— utilized prematurely in the opinion of both experts who testified before the ALJ[11]—involved reading a book to him called "A Terrible Thing Happened." (R.R. at 1595a, 1672a.) Shortly after the therapist's engagement, on February 24, 2012, the following transpired:

> Q. Can you describe what it was, or can you tell us exactly what it was that [Ja.C.] said [for the first time] to you during . . . th[is] session?

---

[11] The department's expert, however, did not feel that an "irretrievable taint" had resulted from the premature use of the book. (R.R. at 1674a.)

14

A. [Ja.C.] said that when he lies on his stomach, his father touches his buttocks, and he demonstrated by lying on his stomach. Then he laid on his back and he said that's when his father[] touches his penis.

Q Now, did he use the words buttocks and penis?

A. He did.

(R.R. at 779a, 1405a.)

A new Childline report ensued. (R.R. at 1374a.) By early March 2012, the police investigation had been reopened[12] and a new inquiry of the Chester County Department of Children, Youth and Families had begun. (R.R. at 454a, 543a, 545a, 1397a.) On March 6, 2017, Ja.C. was interviewed again by the detective who had interviewed him the previous December. (R.R. at 454a-76a, 1046a.)[13]

In this interview, Ja.C. said that J.C. "touches me in bad ways." (R.R. at 463a.) When asked to elaborate, Ja.C. stated that J.C. rubbed his butt and touched his penis. (R.R. at 464a-65a, 468a.) Ja.C. spontaneously provided the detective with a demonstration of the activity by lying on the floor. (R.R. at 471a.) He indicated that the incident, or possibly incidents, had happened prior to the detective's first interview. (R.R. at 471a-72a.)

---

[12] The police suspended J.C.'s periods of overnight custody, according to M.S.'s testimony. (R.R. at 1203a.)

[13] In this interview, before a discussion of the alleged abuse, Ja.C. informed the detective that he and M.S. had been building a box for the purpose of trapping a leprechaun when he came into Ja.C.'s room. (R.R. at 454a.) Ja.C. also said that sometimes when he responded "I don't know" to his mother, she "gets mad at me a little bit." (R.R. at 457a.)

In response to a question as to whether he had "said anything to [J.C.] about the touches you don't like," Ja.C. answered: "Um, my mom said I'm not allowed." (R.R. at 465a.) When asked whether J.C. ever said anything about the touching, either at the time it occurred or afterward, Ja.C. replied "No. . . . 'Cause he doesn't know about that because my mom doesn't, like, want me to tell him." (R.R. at 475a.)

The following day, on March 7, 2012, a caseworker from the Chester County Department of Children, Youth and Families conducted a safety assessment at the residence of Ja.C. and M.S. (R.R. at 545a-48a.) In the presence of M.S., and in response to the caseworker's question as to whether Ja.C. felt safe with J.C., Ja.C. answered in the negative and again spontaneously provided a physical demonstration of J.C.'s misconduct. According to the caseworker:

> When I asked him again if he feels safe with [J.C.], [Ja.C.] stated that he does not feel safe. And I asked him why. And that is when [Ja.C.] laid on the ground and told me that [J.C.] tickles his back, and he asks [J.C.] to stop because he does not like it. And then [Ja.C.] told me he rolls over on his side, and once after he rolls over on his side, [J.C.] puts his hand down inside his clothes and touches his penis.

(R.R. at 546a.) On March 15, 2012, M.S. secured an emergency court order limiting the custodial periods of J.C. to supervised visitation. (R.R. at 380a.)

On April 4, 2012, the caseworker again met with Ja.C. at M.S.'s residence, and asked him if there was "anything he forgot to tell [the caseworker] or

16

[the detective]." (R.R. at 543a.) The following transpired, according to the caseworker's testimony at a preliminary hearing:

> He said, "Yes." After that he stood up and he stated that, "[J.C.] squeezes and tickles my penis," and he grabbed himself with his hand. And then [Ja.C.] said, "He also does this." And [Ja.C.] turned around, he put his hand between his bottom cheeks and was moving it up and down.
>
> And I said, "What did he do?"
>
> He said, "He puts his finger in there."
>
> I said, "In where?"
>
> And he said, "Where my poopie comes out."
>
> And I asked [Ja.C.], "What do you call that body part?"
>
> And he said, "It's my poopie hole."

(R.R. at 543a-44a.)

On April 25, 2012, M.S. sent an e-mail to the local police officer conducting the criminal investigation, advising that Ja.C. had drawn several pictures on April 21, 2012, after she had "just happened to suggest that he DRAW what was making him so angry." (R.R. at 501a.) M.S. told the investigator that Ja.C. responded unexpectedly by producing "graphic stick figure drawings of [J.C.] touching him" and that Ja.C. explained to M.S. what each depicted. (R.R. at 501a.) As provided by M.S. to the police, the drawings were accompanied by post-its on which M.S. memorialized Ja.C.'s descriptive characterizations with comments such

as: “This is daddy with his finger in me,” “This is my penis,” and “This is daddy rubbing my bottom.” (R.R. at 495a-99a, 1413a-26a.)

On April 30, 2012, J.C. was arrested. (R.R. at 1204a.) He was charged with six felonies: aggravated indecent assault (complainant under 13 years of age); indecent assault (victim under 13 years of age); endangering the welfare of children; corruption of minors; aggravated indecent assault without consent; and aggravated indecent assault of a child. (R.R. at 505a-09a.) J.C. was placed in a county prison. (R.R. at 764a, 1882a.) J.C.’s periods of supervised custody terminated. (R.R. at 1204a.)

On May 18, 2012, Ja.C. was interviewed by a Chester County assistant district attorney. (R.R. at 525a.) In this interview, during part of which M.S. was present, Ja.C. asked to consult with M.S. several times, said that he had told the detective who had interviewed him the truth, and expressed an unwillingness to speak with a judge about J.C., even if J.C. was not present. (R.R. at 525a.)[14]

Ultimately, the office of the Chester County district attorney decided not to pursue the criminal charges against J.C., and filed an Application for Nolle Prosequi. (R.R. at 845a.) On April 8, 2013, the Chester County Court of Common Pleas granted the application and the criminal charges against J.C. were nolle prossed. (R.R. at 845a.)

---

[14] This interview was videotaped, but not transcribed. Both J.C.’s and the agency’s experts agreed that the interview included confusing questions, but disagreed as to their import. (R.R. at 859a, 1540a, 1614a.)

By this time, however, the county's Department of Children, Youth and Families had made a determination of indicated report with respect to J.C.'s commission of child abuse, and his name had been listed on the Commonwealth's central register of child abuse as a perpetrator in an indicated report of child or student abuse. (R.R. at 502a-04a, 517a-19a.) Following a review and determination of accuracy of the indicated report by the Office of Children, Youth and Families of the Department of Public Welfare, J.C. filed a request for a formal hearing on the subject. (R.R. at 528a-30a.)

At the hearing, M.S., who identified herself to the hearing judge as "the victim's mother," testified to much of the foregoing. On the subject of her interaction with Ja.C. about physical contact with J.C., M.S. denied originally asking Ja.C. if J.C. was touching him "inappropriately." (R.R. at 1172a, 1242a.) M.S.'s testimony continued as follows:

> Q    Well, you pointed to private areas, didn't you?
>
> A    I don't know where I pointed.
>
> Q    Did you point to his nose?
>
> A    I don't know where I pointed.
>
> Q    Did you point to [Ja.C.'s] mouth? Did you point to [Ja.C.'s] toes?
>
> A    I don't know. I don't really know.
>
> Q    You were specifically asking [Ja.C.] questions about rubbing and touching; weren't you?

A     Apparently, I asked [Ja.C.] if [J.C.] was still rubbing him.

Q     And but you asked [Ja.C.] if [J.C.] was rubbing [Ja.C.] in specific places that you pointed to; correct?

A     I asked [Ja.C.] to show me, and I guess I did. I don't remember the whole encounter. . . .

(R.R. at 1243a.)  Overall, M.S.'s testimony as to the degree to which she had pursued the issue of abuse with Ja.C. was inconsistent.  (R.R. at 1189a, 1285a, 1299a, 1404a, 1406a, 1430a.)

M.S. also denied that she had expected Ja.C.'s school to make a prompt ChildLine report upon discovery of the DAD DONT TOUCH ME note.  (R.R. at 1245a.)   In addition, M.S. did not regard as misleading her statement to her congressman's office that someone at Ja.C.'s school had "found" the note and removed it from Ja.C.'s school bag.  (R.R. at 1369a-71a.)

Preliminary issues for determination by the ALJ included: (a) the admissibility of prehearing statements of Ja.C., and (b) taint with respect to such statements and Ja.C.'s testimony.[15]  (R.R. at 1008a-24a.)  In this regard, two experts were among the witnesses called by the parties.

---

[15] It appears that testimony with respect to these issues was deemed incorporated into the record for purposes of the ultimate decision by the ALJ on the merits.  (R.R. at 1027a-29a.)  It is also to be noted that the reproduced record in this case includes, without objection, some materials related to J.C.'s criminal case.  (Brief for Respondent, at 5 n.1.)

20

On behalf of J.C., William Russell, Ph.D., was qualified as an expert in the field of forensic psychology and the veracity of child victims. (R.R. at 1579a.) With respect to Ja.C.'s sincerity, Dr. Russell made it clear that he did not question Ja.C.'s belief that he had been touched inappropriately.[16] (R.R. at 1629a.)

However, citing factors including Ja.C.'s age, the number of interviews conducted, the context of a custody dispute in which allegations of abuse arose, and inconsistencies in Ja.C.'s accounts, Dr. Russell found "ample evidence" that "the accuracy of [Ja.C.'s] recollection and ability to competently testify" was subject to challenge. (R.R. at 861a, 1587a-88a, 1627a.) Dr. Russell testified that "it really is impossible to say that [Ja.C.'s] statements are reliable." (R.R. at 1588a.)

With respect to the significance of Ja.C.'s age, Dr. Russell testified that "[y]ounger children tend to be more suggestible or susceptible of suggestion, more susceptible to manipulation, more susceptible to misinformation." (R.R. at 1588a.) By way of example, he pointed to beliefs in figures such as the Easter Bunny, Tooth Fairy, and Santa Claus "introduced by an authority or a parental figure or a figure that that child trusts."[17] (R.R. at 1589a.) In addition, younger children "tend to want to please authority figures and will respond in order to please the authority figure," according to Dr. Russell's testimony. (R.R. at 1588a.)

---

[16] With respect to Ja.C., Dr. Russell stated: "I don't think he thinks he's lying." (R.R. at 1629a.) Dr. Russell also gave M.S. the benefit of the doubt on the issue of sincerity: "The problem is [M.S.] believed it. . . . She believed it and she went forward trying to prove that it did to protect [Ja.C.]. That was what [M.S.'s] mind was doing." (R.R. at 1622a.)

[17] To this list, in Ja.C.'s case, might be added leprechauns. (*See* note 13 *supra*.)

21

With respect to the number of interviews, and other types of inquiry, to which Ja.C. was subjected, Dr. Russell testified:

> The more you ask a child something, the more the child wants to answer you. A child—if you're an authority figure and you ask a child something who's four or five years old, they want to answer you. And if they answer you and you don't seem like that answer's acceptable, they try and give you another answer to make that answer.

> In this particular case, you went through—I mean, you can go down the list from [the first caseworker], [M.S.], [the second caseworker], [the assistant district attorney], [the detective], 10 or 12 people who all talked about [J.C.'s] touching with [Ja.C.] and asked him questions about it and expected responses about it.

> * * *
> [Excessive interviewing] really puts the child in a bad position, even if he's telling the truth, because he becomes or she becomes extremely wary. Am I saying the right thing? I have all these authority figures asking me questions. I must not be answering them right.

(R.R. at 1589a-90a, 1625a.)

With respect to the significance of the context in which the allegations of abuse arose, Dr. Russell testified that "all the research regarding false allegations, the overwhelming majority of false allegations of child sexual abuse come out of issues regarding custody disputes and visitation." (R.R. at 1621a.) "The most common factors in those false allegations are present in this case, the contested custody, the zealous mom." (R.R. at 1629a.)

22

Other factors cited by Dr. Russell in the formation of his opinion included the contradictory nature of testimony by M.S. as to whether she had pursued the subject of inappropriate touching with Ja.C., indicia of Ja.C.'s receipt of external and contaminating information, implicit, for instance, in his reference to police chasing J.C., a lack of required balance in interviews focusing upon J.C.,[18] and M.S.'s orchestration of official processes with a view toward validating her position. (R.R. at 1594a-95a, 1618a, 1620a, 1628a.) Dr. Russell also noted Ja.C.'s spontaneous physical demonstrations in interviews, a behavior he had "never seen . . . in 25 years" and suggestive, in his view, of a conditioned response. (R.R. at 1618a.) In rebuttal to Dr. Russell's testimony, the testimony of a psychologist who was qualified as an expert in child sexual abuse was presented by the agency. (R.R. at 1633a-34a, 1641a, 1666a.)

In her rebuttal, this psychologist directed her testimony to the methodology employed by Dr. Russell in reaching his conclusion. (R.R. at 1687a.) She questioned Dr. Russell's emphasis upon Ja.C.'s age, noting that "age doesn't necessarily mean that a child cannot give an accurate report of what's transpired in his life" and that Ja.C. appeared to be more articulate than the average five-year-old. (R.R. at 1667a-68a.)

---

[18] An interview of particular concern to Dr. Russell was that conducted by the assistant district attorney. In this regard, Dr. Russell's report stated that "[t]he repetitive questioning, the leading questions, the confusing questions, repeated questioning, the inappropriate use of body language, bringing the parent into the interview, and then badgering [Ja.C.] in front of [M.S.] during this interview all certainly impacted [Ja.C.'s] thinking, feeling and recollection." (R.R. at 861a.)

The psychologist attributed Dr. Russell's concern with the number of times Ja.C. was subjected to questioning to outdated research. (R.R. at 1668a-69a.) She declined to characterize as contradictory Ja.C.'s statements in the two interviews conducted by the detective, and noted that neither initial nondisclosure of abuse nor a progressive revelation of detail was uncommon in children. (R.R. at 1671a, 1684a-85a, 1763a, 1772a.)

She further testified that she had seen nothing in the record, and had heard nothing in Dr. Russell's testimony, to convince her that a fatal taint had occurred with respect to Ja.C.'s testimony. (R.R. at 1673a-74a.) She conceded, however, that her review of the record did not enable her to opine that Ja.C. was telling the truth and that she could simply say that Ja.C. "might have been abused." (R.R. at 1769a, 1771a.)

The ALJ ultimately ruled that J.C. had failed to prove taint and that Ja.C.'s hearsay statements and testimony would be admissible at the hearing. (R.R. at 1979a.) At a hearing on June 3, 2015, Ja.C., now nine years old, identified himself as *J.S.* (R.R. at 1830a, 1847a.) He stated that he did not remember past visits with his father, but was aware that they had occurred. (R.R. at 1836a.) When asked if anything that happened during the visits had made him feel uncomfortable, Ja.C. related an incident in which J.C. took his phone away. (R.R. at 1837a-38a.) Ja.C. responded that nothing else that had happened there had made him feel uncomfortable. (R.R. at 1837a-38a.)

24

When asked whether Ja.C. knew why his visits with J.C. had stopped, however, the following exchange occurred:

> Q      . . . Did your visits with [J.C.] stop at some time?
>
> A.     Yes.
>
> Q.     Okay. Do you know why they stopped?
>
> A.     Because he did something bad to me.
>
> Q.     Okay. Did he actually do something bad to you?
>
> A.     Yes.
>
> Q.     Okay. And that's what I'm asking you about. Okay. What is it that he did?
>
> A.     He touched me inappropriately.

(R.R. at 1840a.)  Ja.C. testified further as follows:

> Q.     And what happened? How did he touch you?
>
> A.     He touched me uncomfortably.
>
> Q.     Okay. What do you mean uncomfortably? Tell me where he touched you if he touched you.
>
> A.     My privates.
>
>                 * * * *
>
> Q.     Can you talk about—when you say your private area, can you say where that area is?
>
> A.     (Indicating)
>
> Q.     Okay. Pointing to where? Pointing to the middle of your body,—

25

A. Yes.

Q. —the front?

\* \* \* \*

Q. Did this happen on more than one time?

A. I do not think so. Only once.

Q. Okay. And when he touched you where you said he touched you, in your private area, did he do it above your clothes or did he do it underneath your clothes?

A. I was pretty sure underneath.

Q. Okay.

\* \* \* \*

Q. Did he touch you in any other location that made you feel uncomfortable?

A. No.

(R.R. at 1841a-43a.) In response to a question as to whether, prior to police involvement in the situation, M.S. had begun asking Ja.C. "all the time" whether the inappropriate touching was occurring, Ja.C. replied "I believe so." (R.R. at 1863a.)

J.C. also testified at the June 3, 2015, hearing. J.C. said that he had first learned that Ja.C. had stopped using his name when Ja.C. testified on that day and that his reaction to being told of the DAD DONT TOUCH ME note had been to cry. (R.R. at 1871a, 1877a.) J.C. denied the allegation of improper touching. (R.R. at 1882a.) When asked "why Ja.C. would say something like this," he replied, "Only because he was trying to make [M.S.] happy." (R.R. at 1882a.)

26

Following the hearing, the ALJ recommended that J.C.'s appeal be denied. (R.R. at 1961a.) In his adjudication, the ALJ stated that "[t]here exist[ed] no substantial evidence that any adult implanted false memories in [Ja.C.] or subjected [Ja.C.] to coercive questioning." (R.R. at 1979a.) The ALJ found the testimony of M.S. "regarding her questioning the subject child" credible and the testimony of Ja.C. credible. (R.R. at 1968a.)

The ALJ's recommendation was adopted on February 10, 2016 by the BHA. A final order upholding the BHA's decision was entered by the Secretary on October 17, 2016. On November 16, 2016, J.C. petitioned this Court for review.

## STATEMENT OF LAW

*Testimony of children.* One of the difficulties associated with the testimony of children of a young age has been described by the Pennsylvania Supreme Court in *Commonwealth v. Delbridge,* 855 A.2d 27, 39-40 (Pa. 2003), as follows:

> The capacity of young children to testify has always been a concern as their immaturity can impact their ability to meet the minimal legal requirements of competency. Common experience informs us that children are, by their very essence, fanciful creatures who have difficulty distinguishing fantasy from reality; who when asked a question want to give the "right" answer, the answer that pleases the interrogator; who are subject to repeat ideas placed in their heads by others; and who have limited capacity for accurate memory.

27

Stated succinctly, "the ability of a six year old to properly recall and comprehend past events and then adequately communicate these memories is inherently suspect." *Commonwealth v. Judd,* 897 A.2d 1224, 1229 (Pa. Super. 2006).

*Taint.* Taint in connection with the testimony of a child has been described by the Pennsylvania Supreme Court as follows:

> the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify.

*Delbridge*, 855 A.2d at 35.

In *Delbridge,* the Supreme Court held, in the context of a criminal charge of child abuse and with respect to the testimony of the subject child, that evidence of taint is admissible, that a competency hearing is the appropriate venue for considering taint, and that expert testimony may be admitted on the issue of taint. Procedurally, the Supreme Court further held that "the moving party must show some evidence of taint. Once some evidence of taint is presented, [a] competency hearing must be expanded to explore this specific question. During the hearing the party alleging taint bears the burden of production of evidence of taint and the burden of persuasion to show taint by clear and convincing evidence." *Id.* at 40. "[T]he resolution of a taint challenge to the competency of a child witness is a matter addressed to the discretion of the trial court." *Id.* at 41.

28

"When determining whether a defendant has presented 'some evidence' of taint, the court must consider the totality of the circumstances surrounding the child's allegations." *Judd*, 897 A.2d at 1229.

> Some of the factors that are relevant in this analysis are: (1) the age of the child; (2) the existence of a motive hostile to the defendant on the part of the child's primary custodian; (3) the possibility that the child's primary custodian is unusually likely to read abuse into normal interaction; (4) whether the child was subjected to repeated interviews by various adults in positions of authority; (5) whether an interested adult was present during the course of any interviews; and (6) the existence of independent evidence regarding the interview techniques employed.

*Id.*

*Child hearsay.* Under Section 5985.1(a) of the Judicial Code, an out-of-court statement made by a child under the age of 13 who is the victim of sexual abuse can be admitted into evidence where the court finds "that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability" and where the child either testifies at the proceeding or is unavailable as a witness. 42 Pa. C.S. §5985.1(a); *see also J.M., In re I.M. v. Department of Public Welfare,* 52 A.3d 552 (Pa. Cmwlth. 2012). With regard to this exception to the hearsay rule, the reliability, and thus admissibility, of the child's out-of-court statement may be impacted by taint. *See Delbridge,* 855 A.2d at 46-47.

*Expunction burden of proof.* "A child protective services agency will file an indicated report if the investigation by the agency determines that there is substantial evidence of the alleged abuse based upon available medical evidence, the

29

investigation by the child protective services agency, or the admission of the acts of abuse by the perpetrator." *J.M.,* 52 A.3d at 555 (*citing* Section 6303 of the Child Protective Services Law, 23 Pa. C.S. §6303). In this context, substantial evidence is the equivalent of a preponderance of the evidence. *T.H. v. Department of Human Services,* 145 A.3d 1191, 1198 (Pa. Cmwlth. 2016).

"The county agency bears the burden of proving in an expungement case that the actions of the perpetrator constitute child abuse within the meaning of the statute. The county's evidence must outweigh any contrary evidence." *C.F. v. Department of Public Welfare,* 804 A.2d 755, 757 (Pa. Cmwlth. 2002).

<u>APPLICATION OF LAW TO FACTS</u>

In this case, it is difficult to envision a history that would present a more compelling argument for the presence of taint. Each one of the indicia enumerated in *Judd* is present, including the context of a custody dispute in which the allegations of misconduct escalated in accordance with the demands of the litigation, a primary custodian who was unusually likely to read abuse into normal interaction, and repetitive interviews by various adults in positions of authority. The opinion of Dr. Russell, whose area of expertise was more focused upon the issue of taint—i.e., the veracity of child victims—than that of the rebuttal witness, was also of significance.

Without reiterating each fact recited above tending to demonstrate external influence of a contaminating nature, and after careful consideration of the entire record, we are constrained to hold that the ALJ abused his discretion in finding

30

that J.C. failed to prove taint, in deeming Ja.C. competent, and in admitting Ja.C.'s out-of-court statements.

Even if the testimony and out-of-court statements of Ja.C. are deemed to have been properly admitted, the result reached below cannot be sustained. In this case, the agency's indicated report was based upon its investigation, and the validity of the investigation's conclusion depended almost exclusively upon Ja.C.'s allegations. A fair reading of the record concerning these allegations does not support the proposition that the alleged abuse by J.C. has been proven by a preponderance of the evidence.

In this regard, it may be noted that the accounts furnished by Ja.C. are not merely cumulative in detail, but rather are contradictory to such an extent that a finding of credibility on his behalf does little to supply a trier-of-fact with a basis on which to determine, with any degree of assurance, what, when, how often or if misconduct occurred. When the other evidence recited above, which was on balance less than congenial to Respondent's case, is taken into account, the record shows, at most, that Ja.C. "might have been abused."

For the foregoing reasons, the Order of the Secretary of the Department of Human Services is reversed.

_____
J. WESLEY OLER, JR., Senior Judge

31

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| J. C., | : | **SEALED CASE** |
| Petitioner | : | |
| | : | |
| v. | : | No. 1867 C.D. 2016 |
| | : | |
| Department of Human Services, | : | |
| Respondent | : | |

O R D E R

AND NOW, this 28th day of December, 2017, the October 17, 2016 final order of the Secretary of the Department of Human Services in the above-captioned matter is reversed.

_____
J. WESLEY OLER, JR., Senior Judge